DAVID PATTERSON and
DENA PATTERSON,

        Plaintiffs,

                                   CASE NO. 05-74439

v.                                  HON. LAWRENCE P. ZATKOFF

HUDSON AREA SCHOOLS and
KATHY MALNAR,

        Defendants.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Detroit,
State of Michigan, on the 28th  day of November, 2007.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment.  Plaintiffs

have filed a response.  Defendants have since replied. The Court finds that the facts and legal

arguments pertinent to Defendants' Motion are adequately presented in the parties' papers, and the

decision process will not be aided by oral arguments.  Therefore, pursuant to E.D. Mich. Local R.

7.1(e)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted, without this

Court entertaining oral arguments.  For the reasons that follow, Defendants' Motion for Summary

Judgment is GRANTED.

## II. BACKGROUND

When Dane Patterson ("Dane") was 10 years old, he received psychological treatment from Dr. Gretchen Warwick, PhD ("Dr. Warwick"). At that time, Dr. Warwick treated Dane for anger issues related to family dynamics. According to Dr. Warwick, those issues were resolved prior to 2002. On May 2, 2002, Dane began seeing Dr. Warwick again, allegedly due to issues that arose as a result of his attendance at Hudson Middle School while he was in sixth grade. Specifically, Dane claimed he was subject to teasing, name calling and pushing and shoving by other students. Dr. Warwick concluded Dane was distraught, anxious and angry due to school related issues.

In seventh grade at Hudson Middle School, Dane experienced (1) daily name calling, including such things as "fag," "faggot," "gay," "fat pig," "man boobs," and "big boobs" (allegedly more than 200 times that year); (2) being called "Mr. Clean" (allegedly a derogatory term that referred to a lack of pubic hair) on a regular basis; (3) being jostled and pushed in the hallways on a frequent basis (allegedly more than 200 times that year); (4) being slapped by a seventh grade girl named Brittany when Dane attempted to intervene on behalf of a girl being teased and taunted by Brittany; (5) being teased by a teacher, John Redding ("Mr. Redding"), later that same day when Mr. Redding asked Dane in front of the class "How does it feel to be slapped by a girl?"; and (6) after withdrawing from playing on the seventh grade basketball team to focus on his fluctuating grades, at least twice being accused of being a "quitter" by Mr. Redding. By the end of the first semester of seventh grade, Dane wanted to quit school. At that time, Principal Greg Rozeveld ("Principal Rozeveld") offered to mentor Dane through the struggles Dane was experiencing. The parties disagree as to the reasons why, but Mr. Rozeveld did not perform that task for very long.

During sixth and seventh grade at Hudson Middle School, Plaintiffs state that they discussed

with Hudson Middle School personnel issues Dane was experiencing, as follows:

1. Sixth Grade:

    a. Dave Patterson spoke to a teacher about teasing directed at Dane and how Dane felt upset and humiliated.

    b. Plaintiffs attended parent teacher conferences to talk about the name calling, etc.

    c. Plaintiffs met with Principal Rozeveld to discuss the pushing, shoving and name calling of Dane.

2. Seventh Grade:

    a. Plaintiffs and school counselor Susan Mansfield ("Ms. Mansfield") discussed the fact that Dane was having a hard time at school in November and/or December, 2002.

    b. Plaintiffs and several teachers met to discuss Dane's anxiety about being (i) bullied and teased, (ii) the victim of sexually offensive name calling, and (iii) pushed into lockers.

    c. Plaintiffs met with Principal Rozeveld just before Christmas 2002 about Dane not wanting to come back to school because of teasing, bullying, and being called "gay", "fag", "queer." Plaintiffs also discussed the impact of those things on Dane's schooling, his feelings of being ostracized and his suffering grades. Names of perpetrators allegedly were provided. They also discussed the incident of Dane being slapped by Brittany and Mr. Redding teasing Dane about it.

    d. During the second semester of seventh grade, Plaintiffs discussed problems Dane endured with Ms. Mansfield and other staff.

    e. Plaintiffs communicated with school staff throughout Dane's seventh grade year over academic and social issues. The parents asked staff what, if anything, Dane was doing to cause his peers to tease and taunt him. Plaintiffs claim that they were told consistently that Dane was doing nothing wrong.

School records reflect that Dane's grades fluctuated while he was in seventh grade. His progress reports often reflected failing grades, but his final grades were much higher (usually As and Bs). Plaintiffs claim that during seventh grade, Dane was withdrawn and even resorted to eating lunch

in the band room by himself.

Near the end of the 2002-2003 school year (seventh grade), Ms. Mansfield spoke with Lenawee Intermediate School District Social Worker Tammy Cates ("Ms. Cates") about a special education review. Ms. Mansfield and Ms. Cates filled out a referral form and had Mrs. Patterson sign it. Ms. Cates and Brian Moeckel (the School Psychologist) conducted an evaluation of Dane in early summer. At the beginning of Dane's eighth grade year, a Multi-Disciplinary Evaluation Team evaluated Dane for special education services. That team found Dane to be emotionally impaired under the Individuals with Disabilities Educational Act. An Individual Educational Placement Team ("IEPT") was then convened and a special education program was developed for Dane. As part of the program, Dane was assigned to teacher Ted Adams' ("Mr. Adams") resource room during sixth hour. With the aide of Mr. Adams, Dane was able to cope with eighth grade and had a good year.

Upon entering ninth grade at Hudson High School in the fall of 2004, Dane's IEPT program was altered. Mr. Adams was no longer available for resource room services because he was a middle school teacher.[1] Hudson High School Principal Michael Osborne ("Principal Osborne") felt resource room services were not appropriate for Dane. Dane, per the IEPT's decision, remained in general education. Plaintiffs claim that the teasing and bullying Dane experienced in seventh grade began anew, at the same level as in seventh grade. Shortly after classes resumed, Dane allegedly began to be called names such as "gay," "fag," "faggot" and "queer" multiple times daily. The jostling, bumping, pushing and shoving in the hallways also resumed between classes. That fall,

---

[1]Ultimately, Mr. Adams voluntarily served as a contact person for Dane for 25 to 30 minutes a week while Dane was in ninth grade.

three students began to tease Dane about "Mr. Clean." The three students involved were called into a meeting with Dane and Ms. Mansfield. At that meeting, the three students apologized. Dane admits that none of the three ever bothered him again. That same fall, another student, Joe, took Dane's planner in a classroom and inscribed it with (a) sexually derogatory slurs such as "I love penis" and "I lick it in the ass," and (b) sexually explicit pictures of buttocks and penises. Joe was verbally reprimanded by Ms. Mansfield, and Dane never had a problem with Joe again.

In Dane's history class, students were allowed to use note cards during presentations. One student wrote a series of words on the back of some of his notes cards (the side visible to his classmates, including Dane). The first card said "Dane," the second "is," the third "a," and the fourth "fag." This apparently caused intense laughter in the class, although the teacher in the room never saw the incident. After the incident was reported by Dane, Ms. Mansfield called the student into her office, told the student that such action might be sexual harassment and verbally reprimanded the student. The history teacher also reprimanded the offending student. In addition, that student was reported to the administration by Plaintiffs and Ms. Mansfield. Dane did not have any subsequent problems with that student.

In March 2005, Dane's gym locker was broken into, his clothes were removed from the locker and urinated on, and his tennis shoes were thrown into the toilet. School officials were unable to ascertain the perpetrators and no punishment was imposed. Later that spring, Dane arrived at his locker in the hallway to find a poster of "Mr. Clean" taped to it. After the incident was reported, school officials determined that two students were involved. Principal Osborne verbally reprimanded one student, Kyle, because it was his first offense. The second student, Jeff, was suspended for a day because he had committed a prior (unrelated) offense. Dane did not experience

any problems with Kyle or Jeff thereafter.

At about the same time, Dane's locker was vandalized by students who used permanent markers to write such things as "gay," "fag," "queer" and other similar words up and down the locker. In addition, a graphic picture was drawn of a penis being inserted into what appeared to be a rectum. The inside of Dane's locker also had writing on it that stated "suck your mother's tits," "you suck penis" and other similar kinds of things. School administrators immediately had Dane's locker cleaned and investigated this incident. Potential witnesses and students with lockers in the vicinity of Dane's locker were interviewed, but the administrators could not ascertain who committed the acts. That same spring, Dane's gym locker was covered with shaving cream spelling out sexually oriented words on at least one occasion. Again, school administrators were unable to determine the vandals.

In late May 2005, Dane was assaulted in the locker room after one of his junior varsity baseball team's practices. The perpetrator was a student named Lance. Dane had never had any problems with Lance prior to incident, nor had there ever been any allegations that Lance had engaged in any misconduct of a sexual nature. Nonetheless, after baseball practice one Friday, Lance was naked and rubbed his penis and scrotum against the back of Dane's neck and side of his face (an act called "teabagging"). Another student, Nick, blocked Dane's exit from the locker room. Dane informed Plaintiffs of the incident later that day. Dane's brother, the junior varsity baseball team's coach, was informed of the incident later that night (he was not present in the locker room when the incident occurred). Plaintiffs did not contact school administrators that day, nor did they contact the police at that time. The next day, a Saturday, Dane played in the doubleheader with Lance, and the coach of the team (Dane's brother) put Lance in the starting lineup. Plaintiffs did

not inform Hudson Area Schools administrators of the incident until some time during that doubleheader.

On Monday (two days later and the first day of school after the locker room incident), Principal Osborne and Assistant Principal Tom Durbin ("AP Durbin") began conducting a formal investigation into the allegations. Lance immediately was suspended for the remainder of the school year, and he was expelled soon thereafter. Lance's subsequent application for re-entry into the Hudson Area Schools was denied. Although Dane informed the school that Nick was only "joking around," Nick was punished by the Hudson Area Schools. After the Hudson Police Department opened an investigation into the matter several days later (when Plaintiffs filed a complaint), administrators at the Hudson Area Schools cooperated with the Hudson Police Department, including sharing the results of Hudson Area Schools' internal investigation. Lance eventually was criminally prosecuted. No criminal charges were brought against Nick.

At some point following the incident, the varsity baseball coach convened a team meeting of junior varsity and varsity players and commented (with Dane present) that players should only joke with men who can take it. After the locker room incident, Dane's IEPT program was modified to provide for off-site services at Sacred Heart School. After what Plaintiffs describe as a poor tenth grade year for Dane, the IEPT reconvened in 2006 and Dane was allowed to take classes for eleventh grade and twelfth grade through college placement courses.

As a result of the alleged student-on-student harassment directed at him while attending Hudson Area Schools, Dane claims that he has been psychologically unable to step foot inside a Hudson Area School building since the spring of 2005. Dane apparently graduated from Hudson Area Schools a year early and currently is attending college.

### III.  LEGAL STANDARD

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted).  In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.  The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts.  It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. ANALYSIS

**A.     Title IX Claims**

Plaintiffs first allege that Defendants violated Title IX of the Education Amendments of 1972

(hereafter "Title IX"),[2] which provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded
> from participation in, be denied the benefits of, or be subjected to
> discrimination under any educational program or activity receiving
> Federal financial assistance . . .

20 U.S.C.A. §1571(a).

In *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 653 (1999), the Supreme Court held that

recipients of Federal funds (such as Hudson Area Schools) may be liable for damages under Title

IX for student-on-student sexual harassment. In *Davis*, the Supreme Court established that Title IX

may support a claim for student-on-student sexual harassment when the plaintiff can demonstrate

the following elements:

> (1)     The sexual harassment was so severe, pervasive, and objectively offensive
> that it could be said to deprive the plaintiff of access to the educational
> opportunities or benefits provided by the school;
>
> (2)     The funding recipient had actual knowledge of the sexual harassment; and
>
> (3)     The funding recipient was deliberately indifferent to the harassment.

*Vance v. Spencer Cty. Pub. Sch.*, 231 F.3d 253, 258 (6th Cir. 2000).  A single occurrence may give

rise to a finding of a hostile environment within the context of Title IX. *Id.* at 259; *Doe v. School

Admin. Dist. No. 19*, 66 F.Supp.2d 57, 62 (D.Me. 1999).

---

[2]As there is no individual liability for a Title IX claim, the Court hereby DISMISSES
Plaintiffs' Title IX claim as to Superintendent Malnar, to the extent such a claim has been made.
*See Soper v. Haben*, 195 F.3d 845 (6th Cir. 1999).

1. *Severe, Pervasive and Objectively Offensive Conduct*

This prong requires the Court to examine (a) the nature of the conduct (*i.e.*, sexual harassment), (b) whether the conduct was severe, pervasive and objectionably offensive, and (c) whether Dane's access to educational opportunities or benefits provided by the school was adversely impacted and/or denied. In light of *Davis* (the seminal Supreme Court case on student-on-student sexual harassment), *Vance* (the key Sixth Circuit case involving this same issue)*,* and the fact that the Court must view all of the evidence in a light most favorable to the Plaintiffs in deciding this motion (*see Matsushita, supra*), the Court finds that there is sufficient evidence on the record to satisfy all three elements of the first *Davis* prong.

The facts of *Davis* and *Vance* are instructive when evaluating whether the evidence of student-on-student harassment in this case (1) was of a sexual nature, (2) was severe, pervasive and objectively offensive, and (3) adversely impacted or denied Dane's access to educational opportunities or benefits provided by Hudson Area Schools:

> In *Davis*, a male student fondled a female student's breasts; spoke in vulgar language to her; engaged in sexually suggestive behavior toward her; told her "I want to get into bed with you" and "I want to feel your boobs"; and placed a door stop in his pants and acted in a suggestive manner toward her. 526 U.S. at 633-636, 119 S.Ct. 1661. At the end of the string of incidents, the male student pled guilty to sexual battery. *See id.* at 634, 119 S.Ct. 1661. As a result of the harassment, plaintiff alleged that her grades had dropped and she had written a suicide note. *See id.* The Supreme Court found that these actions amounted to severe, pervasive, and objectively offensive conduct, particularly given the offensive touching. *See id.* at 653, 119 S.Ct. 1661.
>
> In [*Vance*], as in *Davis*, Alma [the plaintiff] has submitted abundant evidence of both verbal and physical sexual harassment. Although one incident can satisfy a claim, Alma has presented several instances that reflect not only severity and pervasiveness, but also circumstances that effectively denied her education. On one

occasion, Alma was stabbed in the hand. On another, two male students held Alma while others yanked off her shirt, pulled her hair, and attempted to disrobe. These physical attacks merely layer the testimony regarding verbal propositioning and name calling. In addition, Alma's Title IX complaint, filed with [defendant school] in May 1995, curiously warranted her completing her studies at home, but not an investigation. Given the frequency and severity of both the verbal and physical attacks, it is no wonder that Alma was diagnosed with depression. Given this evidence, Alma has satisfied the severity and pervasiveness requirement.

*Vance,* 231 F.3d at 259 (footnote omitted).

In this case, Dane Patterson was being called "gay," "queer" and "fag" in seventh grade (and perhaps as early as in sixth grade) on a repetitive basis (at least 200 times during his seventh grade school year, according to Dane). During Dane's seventh grade school year, students also began calling him "Mr. Clean." Students taunted Dane with comments such as "man boobs," "big boobs" and other similar terms. In addition, Mr. Redding made fun of Dane in class in front of his peers by stating something to the effect of "How does it feel to be hit by a girl?"

While Plaintiffs say little about in the eighth grade school year, Plaintiffs allege that the harassing conduct resumed with intensity similar to that in the ninth grade. Students again called Dane "gay," "fag," "faggot" and "queer" (allegedly, over 200 times again during ninth grade). As noted above, the references to "Mr. Clean" resurfaced, Dane's planner was defaced by sexually explicit terms and drawings, and the note card incident in history class occurred. In addition, his clothes were urinated on and his shoes thrown into the toilet, his gym locker had sexual epithets written in shaving cream, the exterior of his hallway locker was adorned with words such as "gay," "fag" and "queer," as well as the pictorial display of a penis being inserted into a rectum, and the inside of his locker was vandalized with sexual comments. Finally, at the end of the year, Dane was assaulted by Lance in a manner that clearly was an offensive, sexual touching.

The above acts establish a lengthy and prolonged history of harassment, at least some of which was sexual in nature. Based on the alleged frequency and duration of the harassment (two full school years in a three-year period), it also could be considered severe, pervasive and objectionably offensive.[3] Moreover, the fact that Dane physically stopped attending Hudson Area Schools before his sophomore year constitutes sufficient evidence to create, at a minimum, a genuine issue of material fact as to whether his access to educational opportunities and benefits provided by the school was adversely impaired and/or denied. Accordingly, the Court finds that Plaintiffs have met their burden as to the first prong of the *Davis* test.

2. *Notice Requirement*

In *Davis*, the Supreme Court found that actual notice had been provided to the defendant school where the student and parent repeatedly complained of harassment to the teachers and principal. *Davis,* 526 U.S. at 654. In *Vance*, the student and her mother made repeated verbal and written reports to the school, including teachers and principals, and then filed a Title IX complaint with the school. On that basis, the Sixth Circuit concluded that plaintiff had satisfied her burden of demonstrating defendant had actual knowledge. *Vance*, 231 F.3d at 259.

Plaintiffs testified at their depositions that they repeatedly informed teachers and administrators at Hudson Area Schools that Dane was subject to comments and actions of a sexual

---

[3]In *Davis*, the victim endured five months of harassment, including physical touching and verbal statements that were sexual in nature. In *Montgomery v. Independent Sch. Dist. No. 709*, 109 F.Supp.2d 1081 (D. Mn. 2000), the court recognized as potentially discriminatory conduct things such as taunts against a male based upon perceived sexual orientation, including "faggot", "fag", "gay", "Jessica", "girl", "gay boy", "bitch", "queer", "pansy", and "queen." In that case, the teasing was frequent and continued for a number of years, with an increasing escalation to the point of physical violence manifesting in pushing, kicking, being knocked down, throwing of books around, and smashing a calculator. Those facts can be viewed as similar to the alleged actions toward Dane in the case now before this Court.

nature.  Plaintiffs' and Dane's relevant complaints may have been voiced as early as when Dane was

in sixth grade (but indisputably commenced no later than when he was in seventh grade in the fall

of 2002) and continued off and on until he stopped attending Hudson Area Schools in the spring of

2005.   Plaintiffs' and Dane's complaints were lodged with teachers and administrators, including

Principal Rozeveld, Ms. Mansfield, Mr. Adams, Principal Osborne and AP Durbin.  Dane and/or

the Plaintiffs testified that they notified such persons of all of the incidents described above.  For

purposes of this motion for summary judgment, the Court must accept as true Plaintiffs' claims that

Plaintiffs and Dane repeatedly notified and communicated to the teachers and administrators at

Hudson Area Schools that Dane was being harassed.  Significantly, Defendants do not deny that they

had knowledge of the incidents described above.

As a result of the notices from Plaintiffs and Dane, the Court finds that Defendants had

knowledge of multiple instances of alleged student-on-student sexual harassment involving Dane

as the victim.  Accordingly, the Court concludes that Plaintiffs have satisfied the second prong of

the *Davis* test, as they have demonstrated Defendants had actual knowledge of the alleged sexual

harassment.

3.      *Deliberate Indifference*

A federal assistance "recipient is liable for damages only where the recipient itself

intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts

of harassment." *Vance*, 231 F.3d at 259-60 (citing *Davis*, 526 U.S. at 642).  More specifically,

> the Supreme Court stated that a plaintiff may demonstrate
> defendant's deliberate indifference "only where the recipient's
> response to the harassment or lack thereof is clearly unreasonable in
> light of the known circumstances."

*Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648).  The *Vance* court continued:

The recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "*the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable.*" *Davis*, 526 U.S. at 648-49, 119 S.Ct. 1661. *The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action.*" *Id.* at 648, 119 S.Ct. 1661. The standard does not mean that recipients must expel every student accused of misconduct. *See id.* Victims do not have a right to particular remedial demands. *See id.* Furthermore, courts should not second guess the disciplinary decisions that school administrators make. *See id.*

"The Supreme Court has pointedly reminded us, however, that this is 'not a mere "reasonableness" standard' that transforms every school disciplinary decision into a jury question." *Gant [v. Walling-ford Bd. of Educ.*], 195 F.3d [134,] 141 [(2d Cir.1999)] (quoting *Davis*, 526 U.S. at 649, 119 S.Ct. 161). In an appropriate case, there is no reason why courts on a motion for directed verdict could not identify a response as not "clearly unreasonable" as a matter of law. See *Gant*, 195 F.3d at 141.

*Vance*, 231 F.3d at 260 (emphasis added).

In this case, Plaintiffs argue that once Hudson Area Schools had notice of harassment, the district was required to take (a) immediate and appropriate steps to investigate or otherwise determine what occurred, and (b) prompt and effective remedial steps reasonably calculated to end any harassment, eliminate the hostile environment if one was created, and prevent harassment from occurring again. The Supreme Court has stated that when discrimination has been determined to occur (such as when sexual harassment occurs), the responsible party has a duty to take reasonable, timely, age appropriate, and effective corrective action. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 288 (1998). When a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of these circumstances to eliminate the behavior. *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 364 (6th Cir. 2005). It is clear

that deliberate indifference exists if a district's responses are so inadequate that students undergo harassment or are made more vulnerable to it as a result of the district's responses. *Davis*, 526 U.S. at 645; *Williams*, 400 F.3d at 367. In the instant case, the Court finds that administrators at Hudson Area Schools repeatedly took adequate and effective remedial action reasonably calculated to end harassment, eliminate the hostile environment and prevent harassment from occurring again. The Court also concludes that, as a matter of law, Defendants' responses were not clearly unreasonable in light of known circumstances.

First, in each situation where there was a complaint by the Plaintiffs or Dane, administrators at Hudson Area Schools took action by investigating the incident and, if the perpetrator was identifiable, reprimanding the perpetrator and imposing the punishment the administrators deemed appropriate under the circumstances. In some instances, punishment meant a verbal reprimand and/or extracting an apology from the perpetrator(s), which was the case for: (1) the three students who teased Dane in ninth grade about Mr. Clean, (2) Joe, the student who defaced Dane's planner, (3) Kyle, one of the students who put the Mr. Clean poster up, and (4) the student who used note cards in history class. In some instances, punishment meant a suspension (*e.g.*, for Jeff, the other student who put the Mr. Clean poster on Dane's locker). Finally, in one case, it meant expulsion (for Lance, the student who perpetrated the teabagging incident in the locker room). In each situation, it is undisputed that the perpetrator (whatever his or her form of punishment) did not cause Dane any further problems.

Plaintiffs next argue that Defendants have allowed a known environment of sexual harassment to permeate throughout the Hudson Area Schools for years and have failed to respond to this problem. It is undisputed that a survey conducted of Hudson Area School students in 2002

revealed that sexual harassment was a persistent issue in the Hudson Schools. It is also undisputed that following the 2002 survey, Ms. Mansfield recommended two programs specifically intended to address the issue of harassment in the schools but Defendant Kathy Malnar, Superintendent of the Hudson Area Schools ("Superintendent Malnar"), chose not to pursue those recommendations. Plaintiffs have submitted affidavits of students, former students, parents, teachers and Ms. Mansfield, among others, who have offered their viewpoints that Hudson Area Schools had an environment of (a) profanity, (b) sexually derogatory treatment of students by other students, (c) jostling and pushing of students into lockers by other students, and (d) allowing certain students to be picked on and teased before and after school and between classes (all of which allegedly goes unsupervised because teachers do not have a presence in the hallways).[4] Plaintiffs also assert that notwithstanding their complaints, nothing had changed by the end of the 2004-05 school year. Plaintiffs argue that, in light of this known environment of "sexual" harassment and Superintendent Malnar's choice not to pursue Ms. Mansfield's recommendations, Defendants' responses have been clearly unreasonable and reflect deliberate indifference of Defendants. The Court disagrees.

First, the Hudson Area Schools school board adopted a three page policy prohibiting harassment in 2002, including sexual harassment.[5] Second, this is not a case where Ms. Mansfield's

---

[4]Interestingly, the affidavits make it clear that the labels "gay," "fag," "faggot," "queer," etc. were directed at many students and not solely at Dane. The affidavits also reveal that the other forms of poor and mean spirited behavior (pushing and shoving, teasing, etc.) also were directed at many students other than Dane.

[5] Under that policy, "Sexual Harassment may include, but is not limited to:
    A.      verbal harassment or abuse;
    B.      pressure for sexual activity;
    C.      repeated remarks with sexual or demeaning implications;
    D.      unwelcome touching;
    E.      sexual jokes, posters, cartoons, etc.;

recommendations following the 2002 survey were ignored. Rather, Superintendent Malnar rejected the recommendations of Ms. Mansfield because, as she told Ms. Mansfield, Superintendent Malnar did not believe the recommendations would work. Third, although Ms. Mansfield's recommendations were not pursued, Superintendent Malnar and the Hudson Area Schools took many actions during the time Dane attended Hudson Area Schools to address the issues Plaintiffs cite. For example, Superintendent Malnar opted to focus on character development by bringing in speakers to address the issue, both with students and with staff. Moreover, not all programs proposed by Ms. Mansfield were rejected. Ms. Mansfield spearheaded several initiatives aimed at addressing student conduct while Dane attended Hudson Middle School and Hudson High School. Ms. Mansfield initiated the "Flirting and Hurting Program," which addressed sexual harassment and bullying; the "CATS Program," which addressed dating, bullying, and peer pressure; the "Peer Mediation Program," where students were trained to effectively mediate student problems; and "Positive Peers," which was a mentoring service aimed at addressing kindness, bullying, peer pressure, and conflict resolution.

Fourth, while Dane attended Hudson Area Schools, Hudson Area Schools had specific policies regarding hallway, lunchroom, and locker room supervision. These policies require supervision at all times by teachers and administrators based on shifts. School district administrators and teachers were advised of, and trained on, the above policies. During in-service training sessions held at the beginning of the school year, staff were provided with copies of the Hudson Area Schools' policies regarding student conduct and spend significant time discussing appropriate

---

F.   suggesting or demanding sexual involvement, accompanied by implied or explicit threats concerning one's grades, safety, job, or performance of public duties."

student conduct, which includes bullying, sexual harassment, harassment, and assaults. Teachers and administrators also attended and participated in several school programs designed to educate on bullying and harassment, such as "Character Counts," "40 Developmental Assets," and "Bang, Bang, You're Dead."

Fifth, students also were instructed on the policies and acceptable conduct while attending Hudson Area Schools. At the beginning of each school year, students were provided with a copy of the student code of conduct and teachers spent a portion of the first day of class discussing with the students the student handbook, including the student code of conduct. Beginning in 2000, a student conduct component was added to the Health class curriculum, and this component specifically addressed issues of bullying and harassment.

Finally, in addition to the disciplinary reprimands and punishments imposed on students for the incidents described above (all of which resulted in Dane being left alone by those students), administrators took a number of steps to assist Dane in dealing with the issues he faced in their schools. For example, as Plaintiffs acknowledge, (1) while Dane was in seventh grade, Principal Rozeveld offered to meet with Dane at the end of each day, (2) Ms. Mansfield repeatedly offered to have Dane participate in a group meeting at the school that allowed students to discuss/work through issues, (3) Ms. Cates and Ms. Mansfield, on their own initiative and despite being rebuffed by Plaintiffs, set up testing for special education services for Dane after seventh grade, (4) the IEPT set up a program for Dane in eighth grade which resulted in a successful year, and (5) in ninth grade, reunited Mr. Adams with Dane, even though Mr. Adams continued to work at the middle school.

While Defendants' actions may not be exactly what Plaintiffs desired and while their actions may not have yielded the results Plaintiffs hoped for, applicable law provides that the Plaintiffs do

not have a right to dictate the actions Defendants take. *See Davis*, 526 U.S. at 648. The standard of review for this Court is whether the Defendants acted "clearly unreasonable in light of known circumstances." *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648). Based on the actions of the Defendants described above, the Court cannot say that the Defendants acted clearly unreasonable or with deliberate indifference to the situations which existed at Hudson Area Schools, generally, or with respect to Dane, specifically.

Next, Plaintiffs focus on the locker room incident as conclusive evidence of the deliberate indifference of the Defendants. Plaintiffs direct the Court's attention to the fact that the sexual assault on Dane was not reported by the Defendants, even though AP Durbin indicated that law enforcement routinely is called the day of, or the day after, some incidents. Plaintiffs argue that the Defendants' failure to timely notify police of the locker room incident demonstrates a hesitation or refusal on the part of the Defendants to enforce sexually oriented violations. The Court notes, however, that the incident occurred after school on a Friday, and no school officials knew about the incident until some time on Saturday (the only school "employee" who knew on Friday was Dane's coach, who also happened to be his brother). Then, as soon as school was back in session on Monday, Defendants initiated an investigation into the locker room incident, and Lance was suspended from school that day. Moreover, as a result of the incident, the Defendants expelled Lance from school, denied his subsequent application for re-entry and provided information to the police when a criminal investigation was opened. Finally, although Defendants did not call the police about the incident, even the Plaintiffs did not report the incident to police until almost a week after it occurred (the following Thursday) because they wanted to mull it over. Thus, the Court again concludes the Defendants' actions with respect to this incident were not clearly unreasonable

or deliberately indifferent.

The Court briefly addresses several other arguments raised by Plaintiffs.[6]  With respect to the teabagging incident in the locker room, Plaintiffs argue that (1) coaches have not supervised the locker rooms in the Hudson Area Schools for years, (2) Defendants have never compelled coaches to do so, (3) even though such supervision is required by Hudson Area Schools policy.  Plaintiffs do not, however, offer any proof (or even any allegations) that Defendants had any knowledge of the alleged lack of supervision in the locker rooms.  Next, the Court notes that Plaintiffs make much of the fact that "everyone" who worked for Hudson Area Schools characterized the anti-harassment policy as a zero tolerance policy.  Plaintiffs argue that because every teacher deposed testified to knowledge of verbal sexual harassment occurring regularly within the schools, the cries of zero tolerance ring hollow.  Plaintiffs also point to a 2005 survey of the environment at Hudson Area Schools that concludes sexual harassment and bullying remained issues at Hudson Area Schools. Plaintiffs further rely on affidavits of students and third party adults that Plaintiffs essentially suggest that "upon entering the Hudson Area Schools, any person quickly would be able to discern a high level of sexual harassment." As the *Davis* Court recognized, however, the deliberate indifference standard "does not mean that recipients can avoid liability only by purging the schools of actionable peer harassment or that administration must engage in particular disciplinary action." *Davis*, 526 U.S. at 648.  Rather, recipients can avoid liability by responding "to known peer harassment in a manner that is not clearly unreasonable[,]" which the Court holds the Defendants

---

[6]Plaintiffs spent a fair portion of their briefs addressing the impact the harassment had on Dane.  While this "evidence" is relevant to the issue of whether Dane has been denied equal access to an educational program, it is not relevant in evaluating the deliberate indifference prong of *Davis.*

did in this case, as discussed above. *Davis*, 526 U.S. at 648-49.

Plaintiffs also complain that they (and/or Dane) frequently were told by administrators at Hudson Area Schools that there was nothing that could be done about alleged sexual harassment unless names and proof of the perpetrators could be provided or determined. The Court fails to see how the Defendants' position could be considered deliberately indifferent. If the alleged perpetrators were not identified (either by Dane, the Plaintiffs or persons interviewed by administrators in conducting their investigations), the administration would have been powerless to discipline or punish students without violating their constitutional rights.

Finally, Plaintiffs direct the Court's attention to seemingly every "ugly" incident in the Hudson Area Schools during Dane's academic career, presumably in an attempt to color the Court's view of the Defendants. Without question, there are many things cited by the Plaintiffs that the Court would not condone in an academic (or professional) setting. Some of the things cited by Plaintiffs, however, have absolutely no bearing on this case or the issue at hand. For example, a teacher who swears in class may be a sad commentary on the teacher and/or the school system, but it is not probative to the Plaintiffs' cause of action. Likewise, while the alleged "ongoing pervasive harassment of children not in the 'in crowd'" is not to be condoned, it does not form the basis of a sexual harassment suit rooted in deliberate indifference. Furthermore, the fact that the administration may have been "soft" on proactive measures does not demonstrate that they were deliberately indifferent. Again, applicable law requires only that Defendants respond "to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648-49.

For the foregoing reasons, the Court holds that Defendants were not deliberately indifferent to the alleged sexual harassment against Dane because their actions were not clearly unreasonable

in light of known circumstances. Accordingly, the Court concludes that Plaintiffs' Title IX claim fails as a matter of law and GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' Title IX claim.

**B.      Equal Protection Claim**

"The Equal Protection Clause requires public institutions to 'treat similarly situated individuals in a similar manner.'" *Wayne v. Shadowen*, 15 Fed.Appx. 271 (6th Cir. 2001) (quoting *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1360 (6th Cir. 1996)). "In opposition to a motion for summary judgment, it is plaintiff who possesses the burden of demonstrating that defendants treated similarly situated individuals in a disparate manner." *Buchanan*, 99 F.3d at 1360. In this case, Plaintiffs make no allegation that similarly situated individuals exist. Plaintiffs certainly do not identify any such persons. The Court therefore concludes that Plaintiffs have not shown that there were any similarly situated individuals who were treated differently. Accordingly, the Court holds that Plaintiffs have not met their burden on their Equal Protection claim and GRANTS Defendants' Motion for Summary Judgment on that claim.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED. Plaintiffs' cause of action is therefore DISMISSED WITH PREJUDICE. Judgment shall be entered accordingly.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff                          
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  November 28, 2007

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on November 28, 2007.


s/Marie E. Verlinde                           
Case Manager
(810) 984-3290