# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DANE PATTERSON,[1]

       Plaintiff,                               CASE NO. 05-74439
                                                HON. LAWRENCE P. ZATKOFF

v.

HUDSON AREA SCHOOLS,

       Defendant.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on the 1st day of July, 2010

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for a Judgment as a Matter of Law

or, alternatively, a New Trial ("JMOL Motion") (Docket #191). Plaintiff has filed a response,[2] to

which Defendant replied.[3] The Court finds that the facts and legal arguments pertinent to the JMOL

---

[1]When this case was filed, Dane Patterson was a minor and the original plaintiffs in this matter were his parents, David and Dena Patterson. By the time this case went to trial, however, Dane Patterson was 19 years old. Therefore, the Court determined that Dane Patterson was the real party in interest and ordered that the caption be amended to reflect that Dane Patterson alone had the right to pursue this action (Docket #157).

[2]The Court hereby GRANTS Plaintiff's Ex Parte Motion to Exceed Brief Page Limitation (Docket #198), for the reasons set forth therein.

[3]After (1) Defendant stipulated to a one-week extension with respect to the deadline for Plaintiff to file his response to the JMOL Motion, (2) the Court permitted Defendant to file a 46-page brief, and (3) Plaintiff filed a 45-page response brief, Plaintiff filed a Motion to Strike (Docket #203) Defendant's reply brief as excessive and untimely because it was 15 pages and filed one day late. Defendant responded to Plaintiff's Motion to Strike, and Plaintiff filed a reply. In light of the number of pages in the initial brief filed by Defendant and the response brief filed by Plaintiff, as well as the one-week extension of time within which Plaintiff could file his response brief, the Court hereby DENIES Plaintiff's Motion to Strike (Docket #203) and shall consider Defendant's reply brief.

Motion are adequately presented in the parties' papers, and the decision process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the JMOL Motion be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Defendant's JMOL Motion is GRANTED and Plaintiff's cause of action is dismissed.

## II. THE FACTS

### A. Introduction

In this Court's November 28, 2007, Opinion and Order granting Defendant's motion for summary judgment, the Court extensively set forth and considered the "facts" in a light most favorable to Plaintiff, as it was required to do. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure, the Court must analyze the facts in the same manner. *See* Section III, *infra*. Significantly, however, (1) undisputed trial testimony and trial exhibits exposed a number of critical facts that were not discussed in the parties' briefs addressing Defendant's motion for summary judgment; (2) undisputed trial testimony and trial exhibits revealed that certain key "facts" discussed by the Court in its November 28, 2007, Opinion and Order (and/or by the Sixth Circuit when deciding Plaintiff's appeal of this Court's November 28, 2007, ruling[4]) were not true; and (3) no evidence was offered to support certain key "facts" discussed by the Court in its November 28, 2007, Opinion and Order. Accordingly, the Court sets forth in this Section II the pertinent evidence admitted at trial. Again, to the extent that competing evidence on a particular issue was introduced,

---

[4]*Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009).

the Court considers the facts in a light most favorable to Plaintiff.

**B.     Sixth Grade**

Plaintiff testified that, while attending Hudson Middle School for sixth grade, other students began teasing him and calling him names (including "gay," "fag" and "faggot"). Plaintiff and his parents testified that they reported the name calling to his teachers, Mrs. Fitch and Mrs. Riley, as well as the Hudson Middle School principal, Greg Rozeveld ("Principal Rozeveld"). Gretchen Warwick, PhD ("Dr. Warwick"), a psychologist Plaintiff utilized, testified Plaintiff was distraught, anxious and angry due to school-related issues when she resumed seeing him in May 2002, at the conclusion of Plaintiff's sixth grade year.

**C.     Seventh Grade**

Plaintiff and his parents testified that, while in seventh grade at Hudson Middle School, Plaintiff experienced: (1) daily name calling, including such things as "fag," "faggot," "gay," "queer," and "man boobs" (a term referring to an enlargement of Plaintiff's breast area because he had put on 40 pounds of weight over the summer due to taking medication); (2) in the second half of his seventh grade year, being called "Mr. Clean" on a regular basis; (3) being slapped by a seventh grade girl named Brittany when Plaintiff attempted to intervene on behalf of a girl being teased and taunted by Brittany; and (4) on the same day Brittany slapped Plaintiff, being teased by a teacher, John Redding ("Mr. Redding"), in front of the class, who said to Plaintiff: "Patterson, how did it feel to be slapped by a girl?"

Plaintiff and his parents testified that, as a result of and in order to escape the name calling, in particular the "man boobs" teasing, Plaintiff resorted to eating his lunch in the band room during his seventh grade year. Plaintiff and his parents also testified that, by the end of the first semester

of seventh grade, Plaintiff wanted to quit school. About that time, David Patterson contacted Principal Rozeveld about Plaintiff's struggles. It is undisputed that: (a) Principal Rozeveld offered to meet with Plaintiff at the end of each day to help Plaintiff with his struggles, and (b) an arrangement for Principal Rozeveld and Plaintiff to meet at the end of the day was agreed upon, but that arrangement ended soon after it began. Plaintiff and his parents testified that they discussed issues Plaintiff was encountering during his seventh grade year with Hudson Middle School personnel, as follows:

a.      With school counselor Susan Mansfield ("Ms. Mansfield") in November and/or December 2002.

b.      With several teachers for the purpose of discussing Plaintiff's anxiety about being (i) bullied and teased, (ii) the victim of the name calling, and (iii) pushed into lockers.

c.      With Principal Rozeveld just before Christmas 2002 about Plaintiff not wanting to come back to school because of teasing, bullying and being called "gay," "fag" and "queer." Plaintiff's parents explained to Principal Rozeveld the impact that teasing had on Plaintiff's schooling, Plaintiff's feelings of being ostracized and Plaintiff's suffering grades. Names of perpetrators were provided. The related incidents of Brittany slapping Plaintiff and Mr. Redding teasing Plaintiff also were discussed.

d.      During the second semester of seventh grade, Plaintiff's parents discussed with Ms. Mansfield and other staff problems Plaintiff was experiencing.

e.      Plaintiff's parents communicated with school staff throughout Plaintiff's seventh grade year regarding academic and social issues. Plaintiff's parents asked school staff what, if anything, Plaintiff was doing to cause his peers to tease and taunt him. Plaintiff's parents testified that they were told consistently that Plaintiff was doing nothing wrong.

School records reflect that Plaintiff's grades fluctuated while he was in seventh grade. His progress reports often contained poor or failing grades, but his final grades were much higher.

**D.      Eighth Grade**

The trial testimony regarding the time from the conclusion of Plaintiff's seventh grade year through his eighth grade year is undisputed. At the end of Plaintiff's seventh grade year, as the result of conversations with Dena Patterson, Ms. Mansfield contacted Lenawee Intermediate School District Social Worker Tammy Cates ("Ms. Cates") about conducting a special education review. Ms. Mansfield and Ms. Cates filled out a referral form, and Dena Patterson signed it. Ms. Cates and Brian Moeckel, a school psychologist for Defendant ("Mr. Moeckel") conducted an evaluation of Plaintiff in June 2003 (after school was out). At the beginning of Plaintiff's eighth grade year, a Multi-Disciplinary Evaluation Team evaluated Plaintiff for special education services and concluded that Plaintiff was emotionally impaired ("EI") under the Individuals with Disabilities Educational Act. An Individual Educational Program ("IEP") team (which included Plaintiff's parents but did not include Plaintiff) convened and an IEP was developed for Plaintiff. As part of Plaintiff's eighth grade IEP, an IEP with which Plaintiff's parents agreed, Plaintiff was assigned to teacher Ted Adams' ("Mr. Adams") for five to ten hours per week. Plaintiff's eighth grade IEP required that Plaintiff be physically present in Mr. Adams' EI resource room during sixth hour (the last hour) each day. With the aid of Mr. Adams, Plaintiff enjoyed a successful eighth grade year, a year which was free of the name calling and problems that Plaintiff experienced in seventh grade.

**E.** **Ninth Grade**

Before Plaintiff started ninth grade at Hudson High School, the IEP team met to determine what type of IEP to implement for Plaintiff's ninth grade year. Again, David and Dena Patterson were members of the IEP team but Plaintiff was not (though he was invited to his IEP meeting). David and Dena Patterson both requested that Plaintiff continue to be assigned to Mr. Adams and

receive the same services provided to Plaintiff during his eighth grade year.[5] As a ninth grade student, however, Plaintiff could no longer be assigned to Mr. Adams' resource room because Mr. Adams was a middle school teacher. The IEP team discussed other options, including assigning Plaintiff to the ninth grade EI resource room at Hudson High School. David Patterson testified that "they" (meaning at least he and Dena Patterson) did not want Plaintiff assigned to the ninth grade EI resource room; rather, they only wanted Plaintiff assigned to Mr. Adams. David Patterson acknowledged that, had Plaintiff utilized the ninth grade EI resource room teacher, Plaintiff may have been able to achieve success equal to that enjoyed in eighth grade, however, "they" (again, at least he and Dena Patterson) were not willing to try that arrangement.

Ultimately, after Mr. Adams volunteered to be available to provide services for Plaintiff during Plaintiff's ninth grade year, the IEP team developed an IEP for Plaintiff. David and Dena Patterson expressly agreed to the terms of Plaintiff's ninth grade IEP, which provided that:[6]

1. Plaintiff was assigned to Mr. Adams' resource room for "20-30 minutes per week";

2. Plaintiff assigned to social work counselor "1-2 times per month as need[ed]; 20-30 min session";

3. Plaintiff had access to Mr. Adams' "resource room for crisis intervention" on a "daily as needed" basis; and

---

[5]Hudson Middle School and Hudson High School are housed in the same building.

[6] David and Dena Patterson acknowledged that they signed off on the IEP for Plaintiff's ninth grade year. The IEP document itself, in the same block where David and Dena Patterson signed their names to reflect their agreement with the terms of the IEP, contains several small boxes. Next to each box, there is a statement that indicates the level of familiarity and agreement with the terms of the IEP. The student/parent/guardian signatory to the IEP is to check all boxes for which the corresponding statement is applicable. The statements are: (1) Understand the contents of this plan; (2) Have been informed of my rights (procedural safeguards via written document); (3) Agree with this plan; (4) Do not agree with this plan *but* will allow it to be used; (5) Do not agree with this plan and request: ○ Mediation, *and/or* ○ an impartial due process hearing; (6) Have been given sources (names & phone numbers) to contact to obtain assistance; and (7) Agree that the student is not eligible for special education. David and/or Dena Patterson checked the boxes next to (1), (2) and (3).

6

4. Plaintiff was permitted to use an "alternate site for tests/quizzes" in resource room "as needed throughout school day."

It is undisputed that Mr. Adams provided Plaintiff with resource room services for ninth grade pursuant to the terms of the implemented IEP. It also was the undisputed testimony of witnesses that Plaintiff saw Mr. Adams each week and that Plaintiff had the ability to access Mr. Adams' resource room as he desired.

In early September of Plaintiff's ninth grade year (*i.e.*, right after school started), an incident occurred where Billy H., Sheila K. and Kelly W. asked Plaintiff if Plaintiff remembered being called "Mr. Clean" in middle school. Plaintiff reported this incident to Ms. Mansfield, who is a counselor for both Hudson Middle School and Hudson High School. After speaking with Plaintiff, Ms. Mansfield promptly: (a) summoned Billy H., Sheila K. and Kelly W. to her office to discuss the incident, (b) explained to them that Plaintiff was hurt by their "Mr. Clean" comments, and (c) verbally reprimanded all three of them. Ms. Mansfield then called Plaintiff back into her office, with Billy H., Sheila K. and Kelly W. still present. It is undisputed that the three students apologized to Plaintiff, but that Plaintiff: (1) refused their request for forgiveness, (2) told them that "it was their problem," and (3) left the meeting. Plaintiff testified that he never had a problem with Billy H., Sheila K. or Kelly W. again. Plaintiff and his parents testified that this occurred simultaneously with a number of students calling Plaintiff "gay," "fag" and "queer" on a near daily basis, and Dena Patterson testified that she reported this name-calling to Hudson High School administrators.

Plaintiff and/or his parents reported several incidents to Defendant's administrators in December 2004 (his ninth grade year). On or about December 10, 2004, Joe R. and Jeff L. defaced multiple pages of Plaintiff's daily planner. The single page admitted as evidence included the following terms/drawings: "I love [in the form of a heart] penis," "I lick it in the ass," "I'm a

MaMMa's boy," "I suck on her nipple" and a diagram of a penis being inserted into a rectum with the word "cock" written underneath. Principal Osborne verbally reprimanded Joe R. and Jeff L. for their conduct. The undisputed testimony was that Plaintiff had no problems with Joe R. thereafter. Jeff L. harassed Plaintiff one more time - four days later. On December 14, 2004, Plaintiff returned to his locker to find a poster of "Mr. Clean" taped to his hall locker, an act was perpetrated by Jeff L. and Kyle M.[7] Jeff L. was given a one-day suspension for this act because of his previous transgression against Plaintiff. Kyle M. was verbally reprimanded because he had not previously been disciplined for harassing Plaintiff. Plaintiff testified that he had no problems with either Jeff L. or Kyle M. after they were disciplined for the December 14, 2004 "Mr. Clean" poster incident.

Within a week or two of the December 14, 2004 "Mr. Clean" poster incident, another student, Sabin E., gave an oral presentation in Mr. Reincke's history class. Sabin E. wrote the words "Dane is a fag" on one note card or on four note cards (it is undisputed that those four words were written in that order, regardless of how many cards were used) and made the words visible to the class, including Plaintiff. After class ended, Plaintiff reported the note card incident to Ms. Mansfield. Ms. Mansfield and Mr. Reincke promptly met with and verbally reprimanded Sabin E. Sabin E. apologized to Plaintiff, and Ms. Mansfield followed up with Plaintiff to ensure that there were no further problems with Sabin E. Plaintiff testified that he had no further problems with Sabin E.

The next month, in January 2005, Plaintiff entered the school one morning to find the inside and outside of his hall locker defaced with black permanent marker and paint. The defacement

---

[7]On another (unspecified) occasion in December 2004, another Mr. Clean poster was taped to Plaintiff's hall locker. No one was identified by Plaintiff or anyone else (including Defendant's administrators) as being responsible for that incident.

included the phrases "I like penis" and "man boobs" and a picture of a penis inserted into an anus. Plaintiff did not know who was responsible for defacing his hall locker, but he and/or David Patterson reported this incident to Tom Durbin, the assistant principal of Hudson High School ("AP Durbin") very shortly after Plaintiff saw his defaced locker. AP Durbin immediately had the locker cleaned by a custodian and conducted an investigation of the incident. AP Durbin's investigation included interviewing potential student witnesses, including those students who had lockers in the vicinity of Plaintiff's locker. The perpetrators responsible for this incident were never identified. A month later, in February 2005, someone spelled out "FAG" in shaving cream in large letters on Plaintiff's gym locker room while he was in gym class. Although this incident was reported to Defendant's administrators, the perpetrator was never identified.

## F.     The Locker Room Assault

In the spring of his ninth grade year, Plaintiff played on the Hudson High School junior varsity baseball team. The coach of the junior varsity baseball team was Plaintiff's brother, Andy Wade ("Mr. Wade"). In late May 2005, following a Friday afternoon practice, Plaintiff was assaulted in the boys locker room. One student, Nick H., blocked Plaintiff's exit from the locker room. Another student, Lance P., who was naked, climbed on top of Plaintiff. Lance P. proceeded to rub his penis and scrotum against the back of Plaintiff's neck and side of Plaintiff's face before the assault ended. Mr. Wade was not in the locker room when the assault occurred, and Plaintiff did not tell Mr. Wade (or any other person associated with Defendant) that the assault had occurred before Plaintiff went home with David Patterson. At home that Friday evening, Plaintiff told his parents about the assault. Plaintiff's parents then informed Mr. Wade of the incident later that same night. Plaintiff's parents told Mr. Wade not to contact anyone at Hudson High School about the

incident because they did not want Mr. Wade to get involved. Neither Mr. Wade, Plaintiff nor his parents contacted any Hudson High School administrators or the police about the assault on that Friday, nor did Mr. Wade ever initiate any communication about the assault with Hudson High School administrators.

The next day, a Saturday, the junior varsity team had a scheduled doubleheader. Neither Plaintiff or his parents requested that Mr. Wade permit Plaintiff to skip the games or that Mr. Wade not permit Lance P. to play. As such, both Plaintiff and Lance P. started and played in both games of the doubleheader. At some point during the doubleheader, Dena Patterson informed Principal Osborne about Lance P.'s assault of Plaintiff the previous afternoon. On Monday (the first day of school after the locker room incident occurred and two days after Dena Patterson notified Principal Osborne about the incident), Principal Osborne and AP Durbin began conducting a formal investigation into the allegations. Before the end of school that Monday, Principal Osborne had suspended Lance P. for the remainder of the school year (eight days). As neither Plaintiff nor his parents complained about Nick H.'s role, Principal Osborne did not suspend Nick H.

Plaintiff's parents filed a complaint against Lance P. with the Hudson Police Department two or three days later, and the Hudson Police Department conducted a criminal investigation which eventually resulted in Lance P. pleading guilty to a misdemeanor. Defendant's administrators cooperated with the Hudson Police Department with respect to its investigation, including sharing the results of Defendant's internal investigation. Prior to the commencement of classes in the fall of 2005, Lance P. was expelled from the Hudson Area Schools. Defendant denied Lance P.'s subsequent application for re-entry into the Hudson Area Schools.

No evidence was introduced that any of Defendant's administrators had been notified, or had

reason to believe, that Lance P. had engaged in any misconduct of a sexual nature prior to the locker room assault. Plaintiff testified that he had: (1) never had any problems with Lance P. prior to the locker room assault, and (2) no reason to think that Lance P. would assault him. Likewise, the junior varsity baseball team coach, Mr. Wade, who lived with Plaintiff and taught at Hudson Middle School during Plaintiff's ninth grade year, testified that he was not aware of any occasion when Lance P. had harassed Plaintiff prior to the locker room assault. Mr. Wade also testified that he had no reason to believe Lance P. would assault Plaintiff in the manner Lance P. did. Mr. Wade further testified that he did not believe Plaintiff was at risk of encountering danger, or that Plaintiff needed additional protection or attention, while in the locker room.

At some point soon after the incident, the varsity baseball coach, Mr. Beal, convened a team meeting of junior varsity and varsity players and commented (with Plaintiff present) that players should only joke with men who can take it.

## G.     Completion of Plaintiff's High School Education

After the locker room incident but prior to the commencement of Plaintiff's tenth grade year, Plaintiff's IEP was modified to allow him to receive off-site services at Sacred Heart School for his tenth grade year. Plaintiff and his parents testified that Plaintiff had a poor tenth grade year. As a result, Plaintiff's IEP was modified to allow him to take his eleventh grade and twelfth grade classes through college placement courses, which were paid for by Defendant. Plaintiff graduated from Hudson High School a year early, and he has taken some college courses, primarily online. Plaintiff and his parents testified that Plaintiff psychologically has been unable to enter, and has not entered, any Defendant building since the spring of 2005.

## III. LEGAL STANDARD

Judgment as a matter of law is appropriate where, after a party has been fully heard on an issue, there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 236 (6th Cir. 2003). When reviewing a motion for judgment as a matter of law based on insufficiency of the evidence, the court should not "weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury." *Arban v. West Publishing Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). Rather, the court "views the evidence in a light most favorable to the party against whom the motion is made and gives that party the benefit of all reasonable inferences." *Id.* The motion should be granted "only if a complete absence of proof exists on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426-27 (6th Cir. 2004) (quoting *LaPerrier v. Int'l Union UAW*, 348 F.3d 127, 132 (6th Cir. 2003)). Judgment as a matter of law must be entered for the moving party, however, "if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in the favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).

## IV. ANALYSIS

Plaintiff alleges that Defendant violated Title IX of the Education Amendments of 1972 (hereafter "Title IX"), which provides, in relevant part:

> No person in the United States shall, **on the basis of sex**, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any educational program or activity receiving Federal financial assistance . . .

20 U.S.C.A. §1571(a) (emphasis added).

In *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 653 (1999), the Supreme Court held that recipients of federal funds (such as Defendant) may be liable for damages under Title IX for student-on-student sexual harassment. In *Davis*, the Supreme Court established that Title IX may support a claim for student-on-student sexual harassment when the plaintiff can demonstrate the following elements:

(1)      Plaintiff was subjected to harassment based on sex;

(2)      The sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school;

(3)      The funding recipient had actual knowledge of the sexual harassment; and

(4)      The funding recipient was deliberately indifferent to the harassment.

*Vance v. Spencer Cty. Pub. Sch.*, 231 F.3d 253, 258 (6th Cir. 2000).

**A.     No Denial of Benefits or Discrimination on the Basis of Sex**

As Plaintiff notes in his response brief, the Court gave the jury the following instructions with respect to the first element of Plaintiff's claim:[8]

> With respect to the first element of Plaintiff's claim, he has the burden of proving by a preponderance of the evidence that the offending student's actions were motivated by [Plaintiff]'s sex or gender.

---

[8] The parties agreed to the following language given to the Court as the first required element of proof for Plaintiff's Title IX claim:

> Plaintiff was subjected to harassment because of his sex or gender through the intentional conduct of other students consisting of sexual orientation conduct and/or conduct of a sexual nature in the school program or environment.

Plaintiff must prove that the offending student(s) intentionally harassed Plaintiff on the basis of sex or gender, which simply means that his sex or gender must have been a motivating factor in the offending student's actions or decision even though other factors may also have motivated them.

The term "motivating factor" means a "substantial factor" or a "significant factor."

Harassment is not discrimination based on sex merely because the words or gestures used have a sexual content or connotation, or are based upon gender, sexual orientation or perceived sexual orientation. The harassment must be more than slightly colored with offensive sexual connotations and must actually constitute harassment based upon gender, sexual orientation or perceived sexual orientation.

1.    *Name-Calling*

In this case, Plaintiff testified that other students regularly called him "gay," "fag" and "queer" in sixth, seventh grade and ninth grade. Plaintiff further testified that, in seventh grade and ninth grade, students also called him "Mr. Clean" and directed comments at him such as "man boobs." There was no evidence introduced, however, that would allow a reasonable finder of fact to determine that those terms were based on Plaintiff's sex, sexual orientation or perceived sexual orientation.[9]

First, Plaintiff testified that he is not gay, and no evidence was offered that any of the persons who harassed Plaintiff were gay. Second, no evidence was introduced that anyone perceived Plaintiff to be gay or that any of those persons who harassed Plaintiff were perceived to be gay. Third, no evidence was introduced that any of the harassment stemmed from, or that any of the persons who harassed Plaintiff had: (1) any sexual desire for Plaintiff, (2) a general hostility toward

---

[9]*See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75 (1988) (a Title VII case).

male students, or (3) treated female students differently/better than male students. *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80-81 (1988); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 765 (6th Cir. 2006).

Fourth, no evidence was introduced that Plaintiff was called "gay," "fag," "queer," "Mr. Clean" or "man boobs" because of Plaintiff's sex, sexual orientation or perceived sexual orientation. To the contrary, Plaintiff and his parents testified that the "man boobs" comments began after Plaintiff gained about 40 pounds between the latter part of Plaintiff's sixth grade year and the beginning of his seventh grade year. Such teasing is not sufficient to establish a Title IX claim. *See Davis*, 526 U.S. at 652:

> It is not enough to show, as the dissent would read this opinion to provide, that a student has been "teased," ... or "called ... offensive names[.]" Comparisons to an "overweight child who skips gym class because the other children tease her about her size," the student who "refuses to wear glasses to avoid the taunts of 'four-eyes,'" and "the child who refuses to go to school because the school bully calls him a 'scaredy-cat' at recess," ... are inapposite and misleading.

As to the "Mr. Clean" teasing, although Plaintiff testified that he understood it to be a reference to a lack of pubic hair, no other witness testified that anyone who called Plaintiff "Mr. Clean" or put up a "Mr. Clean" poster intended to connote that meaning. In fact, Plaintiff did not even indicate that someone had communicated such a meaning to him. Likewise, Ryan Hobbs ("Mr. Hobbs"), a former Hudson Area Schools student called as a witness by Plaintiff testified that: (1) he had used the terms "gay," "fag" and "queer" while he attended the Hudson Area Schools, (2) he did not consider any of those words to be sexually discriminatory or sexually harassing, and (3) he did not use those terms in a sexual way. Even the two "school-related" witnesses called by Plaintiff, Glen Stutzky ("Mr. Stutzky") and Angela Johnston ("Ms. Johnston"), testified that school-aged

children often use words such words as "gay," "fag" and "queer" without understanding their meanings or that those words can be hurtful. Mr. Stutzky and Ms. Johnston, as well as many other witnesses, also testified that school-aged children often use those words as part of their vernacular to describe a variety of things or people, in a nonsexual manner. No witness testified, and no evidence was introduced, that any person who called Plaintiff those names intended them in a sexual manner.

## 2. *Other Acts*

Aside from the verbal name calling described above and the locker room assault discussed below, there were few other incidents to which Plaintiff was subjected. In seventh grade, there was one such incident, which did not involve student-on-student harassment; that is, when Mr. Redding made fun of Plaintiff in class by stating something to the effect of "Patterson, how does it feel to be hit by a girl?" In December of his ninth grade year, several incidents occurred within days of each other: Plaintiff's planner was defaced with sexually explicit terms and drawings, a "Mr. Clean" poster was taped to Plaintiff's locker and the note card incident in history class (another reference to Plaintiff being a "fag"). In January, unidentified persons put words such as "gay," "fag" and "queer," as well as a pictorial display of a penis being inserted into a rectum, on the outside of his locker, and the inside of his locker was vandalized with sexual comments. In February, someone wrote "FAG" with shaving cream on his gym locker. Finally, there were the comments made by Mr. Beal, the varsity baseball coach, about only playing a joke on someone who can take it (again, this did not involve student-on-student harassment).

Many of these "acts" simply constituted another form of name calling (*i.e.*, "gay," "fag," "queer" and "Mr. Clean" in a written form is no different from a verbal occurrence). Thus, there

were but four incidents (the planner, some of the locker defacement, the comments of Mr. Redding and the comments of Mr. Beal) which arguably included sex-based content. Significantly, however, as noted above and as the jury was instructed:

> Harassment is not discrimination based on sex merely because the words or gestures used have a sexual content or connotation, or are based upon gender, sexual orientation or perceived sexual orientation. **The harassment must be more than slightly colored with offensive sexual connotations and must actually constitute harassment based upon gender, sexual orientation or perceived sexual orientation.**

Although each of these four incidents may be been colored with offensive sexual connotations, no evidence was introduced that the "harassment [was] based upon gender, sexual orientation or perceived sexual orientation" of Plaintiff.

     *3.     Locker Room Assault*

Lance P.'s assault of Plaintiff clearly constituted an offensive, sexual touching. As with the other instances in this case, however, there was no evidence offered that the actions of Lance P. were based upon the gender, sexual orientation or perceived sexual orientation of Plaintiff - or Lance P., for that matter. Rather, while the evidence demonstrated that Lance P.'s actions were unbelievably stupid, cruel and hurtful to Plaintiff, there was no evidence presented that Lance P.: (1) acted out of sexual desire for Plaintiff, (2) had any general hostility toward males, or (3) treated males differently than females. The Court in no way condones the behavior of Lance P., but the Court concludes that Lance P.'s conduct did not constitute discrimination or harassment on the basis of sex for which Title IX provides a legal remedy.

     *4.     Conclusion*

Although the Court finds the harassment in this case deplorable and is sympathetic to

students who are subjected to such behavior, the harassment directed at Plaintiff was typical of

middle school and high school behavior.  As stated by the U.S. Supreme Court:

> Whether gender-oriented conduct rises to the level of actionable "harassment" thus "depends on a constellation of surrounding circumstances, expectations, and relationships," *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), including but not limited to, the ages of the harasser and the victim and the number of individuals involved, see OCR Title IX Guidelines 12041-12042.  Courts, moreover, must bear in mind that schools are unlike the adult workplace.  **Children may regularly interact in a manner that would be unacceptable among adults.** See, *e.g.*, Brief for National School Boards Association et al. As *Amici Curiae* 11 (describing "dizzying array of immature ... behaviors by students").  Indeed, at least early on, **students are still learning how to interact appropriately with their peers.  It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it.**  Damages are not available for simple acts of teasing and name-calling among children, however, even where these comments target differences in gender.  Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651-52 (emphasis added).[10]

More significantly, the Court notes that although this case was brought as a Title IX case,

which requires discrimination or harassment on the basis of sex, Plaintiff consistently argued and

presented a case on bullying.  Plaintiff seized on the theme that he was harassed because he did not

---

[10] The Court's instructions to the jury regarding whether the alleged sexual harassment was "severe, pervasive, and objectively offensive" included numerous portions of the *Davis* Court's language quoted above:

> Schools are unlike the adult workplace.  Children may regularly interact in a manner that would be unacceptable among adults.  Simple acts of teasing and name-calling among children do not constitute sufficiently severe, pervasive, and objectively offensive sexual harassment, even when those comments target differences in gender.  The sexual harassment must have been so severe, pervasive and objectively offensive that it had the effect of denying Plaintiff equal access to educational opportunities or benefits provided by Defendant.

conform to the stereotypical male in the Hudson Area Schools. This theme was promoted at every opportunity: in his opening statement, throughout his case-in-chief, in his closing argument and even in his response brief. As stated in his response brief, it is Plaintiff's position (and the Court accepts it as true for purposes of deciding this JMOL Motion), that: (a) Hudson Area Schools had "a highly charged environment where the common perception of a male gender was the aggressive male football player and wrestler[,]" and (b) Plaintiff, "a person of slight build," was the subject of "attacks on [his] gender and the perception he is not a man."

In furtherance of this theme, Plaintiff response brief identifies some of the trial testimony of Mr. Hobbs and Dr. Warwick:

> Mr. Hobbs also testified, contrary to the Defendant's claim, that male football players and wrestlers were given high social status within the Hudson school environment and that male students who did not fit the aggressive male model for football and wrestling were treated or subjected to treatment that demeaned them as males or young men. These non-stereotypical males were viewed as not truly "male" and were frequently singled out for treatment in the form of harassment.

> Dr. Gretchen Warwick, who had much familiarity and understanding of the Hudson community, and as a licensed psychologist, testified that football was the most important activity in Hudson community. Intellectual values for males was not Hudson's strong point. In her opinion, the valuing of athletic ability related to physical aggressiveness, as opposed to a male student preferring intellectual ability over football, created a lower social status level for the male students who favored academics and increased risk of their being targeted for bullying or harassment.

In fact, Mr. Hobbs also testified that Plaintiff was teased because Plaintiff participated in socially unpopular activities, such as Science Olympiad, rather than football or wrestling. As Plaintiff's arguments and the testimony of Mr. Hobbs and Dr. Warwick, among others, exemplify, the basis of Plaintiff's case (and the harassment to which he was subjected) really is the byproduct of the

social status or structure in schools. For good or bad, in the Hudson Area Schools, like many schools, that means the successful athletes (jocks) are at the top level of social status structure and the scholars are at a lower social status level. Title IX does not, however, protect students against being teased or harassed because of their social status; it only protects against harassment or discrimination on the basis of sex.

For the reasons set forth above, the Court concludes that the harassment to which Plaintiff was subjected in sixth, seventh and ninth grade constituted bullying, not sexual harassment. As Title IX protects only harassment or discrimination based on sex, the Court finds that Plaintiff's cause of action must be dismissed as a matter of law.[11]

**B.      No Deliberate Indifference**

Assuming, for purposes of this section of this Opinion and Order only, the other elements of Plaintiff's Title IX claim have been satisfied, the Court finds that, as a matter of law, Defendant was not deliberately indifferent.

A federal assistance "recipient is liable for damages only where the recipient itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment." *Vance*, 231 F.3d at 259-60 (citing *Davis*, 526 U.S. at 642). More specifically, "the Supreme Court stated that a plaintiff may demonstrate defendant's deliberate indifference 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648). The *Vance* court continued:

---

[11]The Court also concludes that, to the extent that there was any actionable Title IX harassment, such harassment was not "so severe, pervasive, and objectively offensive that it could be said to deprive [Plaintiff] of access to the educational opportunities or benefits provided by [Defendant]."

The recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648-49, 119 S.Ct. 1661. The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id*. at 648, 119 S.Ct. 1661. The standard does not mean that recipients must expel every student accused of misconduct. *See id.* Victims do not have a right to particular remedial demands. *See id.* Furthermore, courts should not second guess the disciplinary decisions that school administrators make. *See id.*

"The Supreme Court has pointedly reminded us, however, that this is 'not a mere "reasonableness" standard' that transforms every school disciplinary decision into a jury question." *Gant [v. Wallingford Bd. of Educ.*], 195 F.3d [134,] 141 [(2d Cir.1999)] (quoting *Davis*, 526 U.S. at 649, 119 S.Ct. 161). In an appropriate case, there is no reason why courts on a motion for directed verdict could not identify a response as not "clearly unreasonable" as a matter of law. See *Gant*, 195 F.3d at 141.

*Vance*, 231 F.3d at 260. The instant case presents exactly the kind of case where it is appropriate for a court to grant a motion for judgment as a matter of law because Defendant's response was not "clearly unreasonable" (*i.e.*, deliberately indifferent) as a matter of law.

When discrimination such as sexual harassment has been determined to occur, the responsible party has a duty to take reasonable, timely, age appropriate and effective corrective action. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 288 (1998). As the Court instructed the jury in this case:

With respect to the fourth element of Plaintiff's Title IX claim, "deliberate indifference" is not a mere "reasonableness" or "negligence" standard. Rather, it means that Defendant's response to the alleged harassment, or lack of response, was clearly unreasonable in light of all the known circumstances.

"Deliberate indifference" also means more than mere

"recklessness" on the part of Defendant. "Recklessness" requires only proof that a reasonable person would have appreciated the great degree of risk of harm to Plaintiff. In order for an act to be "deliberate," Defendant must have been shown to have been aware that adverse consequences from its action or inaction were certain or substantially certain to cause harm. Before you can find that Defendant was deliberately indifferent, Plaintiff must prove Defendant was aware that a particular act or inaction was certain or substantially certain to cause Plaintiff harm and that Defendant decided to act or not act in spite of that knowledge.

A school district is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules. Defendant need only respond to known peer harassment in a manner that is not clearly unreasonable. The deliberate indifference standard does not mean that Defendant can avoid liability only by purging its schools of actionable peer harassment or that administrators must engage in particular disciplinary action. The standard does not mean that Defendant must expel every student accused of misconduct. Victims do not have a right to any particular remedial demands.

Where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

*Relying on and quoting from Davis*, 526 U.S. at 648-49; *Paint Valley*, 400 F.3d at 367; *Vance*, 231 F.3d at 260, 261, 263-64.

In the instant case, the Court finds that the uncontroverted evidence is that Defendant's teachers and administrators responded to each and every incident of harassment of which they had notice. More critically, the Court concludes that, as a matter of law, there was no evidence whatsoever presented that Defendant "was aware that adverse consequences from its action or inaction were certain or substantially certain to cause harm ... and that Defendant decided to act or

not act in spite of that knowledge." *Vance*, 231 F.3d at 263-64. In other words, the Court finds, as a matter of law, that Defendant "responde[d] to known peer harassment in a manner that [was] not clearly unreasonable." *Davis*, 526 U.S. at 649.

First, the undisputed testimony was that Ms. Mansfield initiated the process to qualify Plaintiff for resource room consideration after hearing complaints from and having discussions with Dena Patterson regarding Plaintiff's struggles in seventh grade at Hudson Middle School. The evidence also uniformly established that Defendant's employees (Ms. Mansfield, Ms. Cates and Mr. Moeckel) put in time over their summer vacations to evaluate Plaintiff's eligibility for resource room services so that Plaintiff could be assigned to a resource room from the first day of his eighth grade year. Second, the witnesses consistently testified that, in Plaintiff's eighth grade year, he was not subjected to harassment of the nature he had been in sixth and seventh grade.

Third, the witness uniformly attributed Plaintiff's successful eighth grade year to Plaintiff's assignment to Mr. Adams' resource room, an assignment that resulted from efforts initiated by Defendant's employees. As Plaintiff and his parents testified that the harassment to which Plaintiff was subjected in sixth and seventh grade disappeared when Plaintiff was in eighth grade (and no evidence to the contrary was offered), the Court finds that there is no genuine issue of material fact that Defendant's response was adequate and effective in addressing the harassment to that point. As such, the Court finds that, as of the time Plaintiff entered ninth grade at Hudson High School, Defendant's response was not clearly unreasonable (*i.e.*, deliberately indifferent) as a matter of law.

With respect to the harassment in ninth grade about which Plaintiff and/or his parents complained to Defendant's administrators, the undisputed testimony was that:

1. Defendant's administrators investigated each incident promptly after being notified of the incident;

23

2.    In cases where the perpetrator(s) was/were identifiable, Defendant's administrators reprimanded the perpetrator(s) and imposed the punishment the administrator(s) deemed appropriate under the circumstances;

3.    In most instances, the punishment imposed was a verbal reprimand of the perpetrator(s) and/or extracting an apology from the perpetrator(s);

4.    In only one instance did a student who was verbally reprimanded subsequently harass Plaintiff (*i.e.*, other than the subsequent harassment by Jeff L., discussed in parts 5 and 6 below, Plaintiff admitted that all students verbally reprimanded by Defendant's administrator(s) never harassed him again);

5.    Jeff L. was the only recidivist student;

6.    Jeff L. harassed Plaintiff for a second time when he participated in taping a Mr. Clean poster to Plaintiff's locker only days after being verbally reprimanded for participating in the defacement of Plaintiff's planner;

7.    In response to Jeff L.'s second offense, Defendant suspended Jeff L. for a day and, thereafter, Jeff L. never harassed Plaintiff again;

8.    Prior to the locker room assault, Lance P. had never harassed Plaintiff and neither Plaintiff, Mr. Wade, nor any administrator or teacher at Hudson Area Schools had reason to believe that Lance P. would assault Plaintiff (or anyone else);

9.    On the first school day after the locker room assault, Principal Osborne and AP Durbin conducted an investigation and, on that same day, Principal Osborne suspended Lance P. from school for the duration of the school year;

10.   Defendant's administrators cooperated with the Hudson Police Department and law enforcement officials in the criminal investigation of Lance P.;

11.   Defendant expelled Lance P. from the Hudson Area Schools prior to the commencement of the next school year; and

12.   Defendant subsequently denied his request for re-admission.

As is clear from the foregoing, the undisputed responses by Defendant (some of which are set forth in greater detail in Section II) were prompt and effective. On the one occasion that a student harassed Plaintiff following the initial form of discipline, Defendant increased the punishment from a verbal reprimand to a suspension. This form of graduated punishment, one typically used in a

school setting (as well as in the criminal justice arena), proved effective.

The evidence introduced at trial also revealed that Defendant had policies in place and promoted activities that address sexual harassment, notwithstanding Plaintiff's assertions and the suggestion of Sixth Circuit majority to the contrary.  First, in 2002, Defendant's school board adopted a three-page policy prohibiting harassment, including sexual harassment.[12]  This policy was in place while Plaintiff attended Hudson Middle School and Hudson High School.  Second, each student is given a student handbook on the first day of school each year.  The student handbook contains a code of conduct.  The student handbook also defines sexual harassment, states that sexual harassment is prohibited and instructs students to report sexual harassment to school administrators.  Third, students were instructed on these policies and acceptable conduct while attending Hudson Area Schools, including by their teachers, who spend a portion of the first day of class discussing the student handbook, including the student code of conduct, with students.

Fourth, prior to the time Plaintiff completed his ninth grade year, Defendant hosted or

---

[12] The policy provided, in part:

> Harassment of students is prohibited, and will not be tolerated.
> * * * * *
> Harassment is defined as inappropriate conduct that is repeated enough, or severe enough, to negatively impact a student's educational, physical or emotional well being.  This would include harassment based on any legally protected characteristics, such as sex, ..."
> * * * * *
> Sexual Harassment may include, but is not limited to:
> | | |
> |---|---|
> | A. | verbal harassment or abuse; |
> | B. | pressure for sexual activity; |
> | C. | repeated remarks with sexual or demeaning implications; |
> | D. | unwelcome touching; |
> | E. | sexual jokes, posters, cartoons, etc.; |
> | F. | suggesting or demanding sexual involvement, accompanied by implied or explicit threats concerning one's grades, safety, job, or performance of public duties. |

maintained a number of programs which, according to Mr. Stutzky, addressed, at least in part, sexual harassment: the "Flirting and Hurting Program" initiated by Ms. Mansfield, "Bang, Bang, You're Dead," "Positive Peers" and "Concerned About Teen Sexuality." Fifth, beginning in 2000, a student conduct component was added to the Health class curriculum, and this component specifically addressed issues of sexual harassment.

Sixth, while Plaintiff attended Hudson Area Schools, Defendant had specific policies regarding hallway, lunchroom, and locker room supervision. These policies require supervision at all times by teachers and administrators based on shifts. School district administrators and teachers were advised of, and trained on, the above policies. During in-service training sessions held at the beginning of the school year, the Hudson Middle School and Hudson High School staff were provided with copies of Defendant's policies regarding student conduct and spent time discussing appropriate student conduct, including what sexual harassment means.

The Court now turns to what appeared to be a, if not the, key reason this case was remanded to this Court for trial: the Sixth Circuit's belief that the evidence, taken in a light most favorable to Plaintiff, demonstrated that resource room services were not available to Plaintiff during his ninth grade year.[13] At the time the summary judgment motion was briefed before this Court, this Court

---

[13]The Sixth Circuit stated:

> One key difference between *Theno* and this case is that Hudson did at one point employ a system that successfully combated the harassment of [Plaintiff], i.e., the use of the resource room during eighth grade. In the instant case, a reasonable jury could thus conclude that Hudson was not only aware of what did not work, but also was aware of what had worked to insulate [Plaintiff] from the harassment. **However, in ninth grade, Hudson discontinued the use of the resource room**. The cycle of harassment then intensified, and Hudson's only response was to employ the same type of verbal reprimands that it had used unsuccessfully in response to the sixth- and seventh-grade harassment. **Given that Hudson knew that its methods were ineffective, but did not change those methods, "a reasonable jury certainly could conclude that at some point during the ... period of harassment[,] the school district's standard**

was not presented with evidence of how Plaintiff's IEP services for ninth grade evolved or were resolved. At trial, however, the undisputed testimony was that, at the IEP team meeting preceding Plaintiff's ninth grade year, one of the IEP options discussed for Plaintiff's ninth grade year was for him to receive services in the ninth grade EI resource room. There was absolutely no testimony whatsoever that Defendant discontinued the use of the resource room or that Defendant did not make a resource room available to Plaintiff. In fact, there was testimony that the ninth grade EI resource room was operational during Plaintiff's ninth grade year. In other words, the undisputed evidence is that Defendant **did not discontinue** the use of the resource room for Plaintiff during his ninth grade year.

Moreover, the undisputed testimony is that **David and Dena Patterson** did not want Plaintiff in the ninth grade EI resource room; rather, they wanted Plaintiff to be placed in a middle school resource room, even though Plaintiff was in high school. The testimony is further undisputed that David and Dena Patterson **agreed** to have Plaintiff's IEP set up such that Plaintiff would report to their preferred teacher, Mr. Adams, for resource room 20-30 minutes a week and on a daily basis, as needed. As described in Section II.E. (including footnote 6), David and Dena Patterson affirmatively expressed their agreement with that arrangement when signing the IEP document for Plaintiff's ninth grade year.

Although the ninth grade IEP may not have been exactly what Plaintiff (or his parents) desired, and while Defendant's actions may not have yielded the results Plaintiff (or his parents)

---

**and ineffective response to the known harassment became clearly unreasonable."** *Theno* [*v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F.Supp.2d 952, 966 (D.Kan. 2005)].

*Patterson*, 551 F.3d at 448-49 (emphasis added).

hoped for, applicable law provides that Plaintiff (and his parents) did not "have a Title IX right to make particular remedial demands." *See Davis*, 526 U.S. at 648. Likewise, the law is well-established that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n.9 (1985). Thus, this Court must adhere to the standard of review set forth by the *Davis* Court, *i.e.*, the Court simply is to determine whether Defendant acted "clearly unreasonable in light of known circumstances." *Vance*, 231 F.3d at 260 (quoting *Davis,* 526 U.S. at 648). Based on the undisputed responses of Defendant's administrators to reported incidents of harassment, as well as the implementation of an eighth grade IEP and the efforts to create and implement an IEP satisfactory to Plaintiff (and his parents) for the ninth grade year, the Court finds, as a matter of law, that Defendant did not act clearly unreasonably or with deliberate indifference to the known acts of harassment directed at Plaintiff.[14]

For the foregoing reasons, the Court holds that Defendant was not deliberately indifferent to the alleged sexual harassment against Plaintiff because Defendant's actions were not clearly unreasonable in light of known circumstances. Accordingly, the Court concludes that Plaintiff's Title IX claim fails as a matter of law, and therefore GRANTS Defendant's JMOL Motion, on this basis as well.

---

[14] The Court also notes that, in addition to the disciplinary reprimands and punishments imposed on students for the incidents described above (all of which resulted in Plaintiff being left alone by those students), Defendant's administrators took a number of steps to assist Plaintiff in dealing with the issues he faced in their schools. For example, although Defendant and/or its employees had no obligation to provide many services to Plaintiff, even as a student receiving IEP services, Plaintiff and/or his parents acknowledged at trial that the following were true: (1) while Plaintiff was in seventh grade, Principal Rozeveld offered to meet with Plaintiff at the end of each day, (2) Ms. Mansfield repeatedly offered to have Plaintiff participate in a group meeting at the school that allowed students to discuss/work through issues, and (3) in ninth grade, Mr. Adams continued to be available to Plaintiff, even though Mr. Adams continued to work at the middle school and did not have to be available to Plaintiff.

**C.**  **Conditional Ruling on a Motion for a New Trial**

Pursuant to Rule 50(c) of the Federal Rules of Civil Procedure, the Court must conditionally rule on Defendant's Rule 59 motion for new trial in the event the Court's grant of Defendant's JMOL Motion is vacated or reversed. A new trial is warranted under Rule 59(a) when a jury has reached a "seriously erroneous result," as evidenced by the verdict being against the great weight of the evidence. *Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). As the Sixth Circuit has stated:

> In ruling upon a motion for a new trial based on the ground that the verdict is against the great weight of the evidence, a district judge must compare the opposing proofs and weigh the evidence . . . and "it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence. . . ."
>
> * * * * *
>
> "Courts are not free to reweigh the evidence and set aside the jury verdicts merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

*Bruner v. Dunaway*, 684 F.2d 422, 425 (6th Cir. 1982) (citations omitted).

For the reasons set forth above, the Court concludes that the jury verdict was against the great weight of the evidence. More specifically, the Court finds that the great weight of the evidence did not support a finding that: (1) Plaintiff was subjected to harassment based on sex; (2) even if the harassment was based on sex, it was severe, pervasive, and objectively offensive; or (3) Defendant was deliberately indifferent to the harassment. The Court therefore concludes that the jury verdict in favor of Plaintiff on his Title IX claim should be set aside. Accordingly, should the Court's grant of Defendant's JMOL Motion be vacated or reversed, the Court grants Defendant's alternative motion for a new trial.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, IT IS HEREBY ORDERED that Defendant's Motion for Judgment as a Matter of Law (Docket #191) is GRANTED.  Plaintiff's cause of action is therefore DISMISSED WITH PREJUDICE.  IT IS FURTHER ORDERED that all motions not addressed in this Opinion and Order are hereby DENIED AS MOOT.

Concurrent with the issuance of this Opinion and Order, the Court is entering an Order to Strike the Judgment entered by this Court on March 30, 2010.  A new Judgment dismissing Plaintiff's cause of action shall be entered accordingly.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  July 1, 2010


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on July 1, 2010.


s/Marie E. Verlinde
Case Manager
(810) 984-3290